**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| RALPH T. BYRD *et al.*, | |
| Appellants, | |
| v. | Civil Action No. 8:11-cv-01045-AW |
| GREGORY PAUL JOHNSON *et al.*, | |
| Appellees. | |

## MEMORANDUM OPINION

### I.      INTRODUCTION

This Memorandum Opinion represents the latest chapter in an epic saga that one might suitably title *To Make a Mountain Out of a Molehill*. What started as an involuntary action to collect a $30,000 credit card debt from a single debtor spiraled inexorably into decade-long litigation unleashing thousands of docket entries, multiple appeals, and administrative expenses in the hundreds of thousands of dollars. The transmogrification of this relatively minor case into a behemoth owes to the vexatious and overzealous manner in which pro se Appellant Ralph T. Byrd has litigated it. Fittingly, this Court has previously characterized some of his tactics as "bad faith," "dilatory and frivolous," "designed to frustrate the judicial process," and "reek[ing] of flagrant abuse." So obstructive were Byrd's shenanigans that he was held in contempt, sanctioned, removed from his residence, and disbarred as a consequence.

The bankruptcy court sounded the death knell for this tragic tale in 2011 when it issued a final decision approving the trustee's application for compensation and reimbursement and closing the case. Doc. No. 1-335. Predictably, Byrd has appealed the bankruptcy court's

1

decision. One can distill the extraordinary volume of arguments Byrd makes in his overlength, fifty-four-page appellant's brief into two pivotal propositions. One is that the bankruptcy court erred in appointing a Chapter 11 trustee. The other is that the bankruptcy court erred in approving $351,622.51 in administrative expenses for allegedly conflicted entities. Neither of these propositions has merit. Accordingly, the Court affirms the bankruptcy court's decision.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The source of the instant dispute is a credit card debt that Appellant Ralph T. Byrd (Byrd) owed Platinum Financial Services (Platinum). *See In re Byrd*, 357 F.3d 433, 436 (4th Cir. 2004). Platinum held six of Byrd's credit card accounts totaling over $74,000. *Id.* Platinum "filed separate actions in Maryland state court to collect on three of the accounts." *Id.* Byrd's primary defense to these charges was that his credit card issuers failed to comply with Maryland's Retail Credit Accounts Law (RCAL). *Id.* RCAL "prohibits a card issuer from assessing finance charges on any transactions other than cash advances, unless the issuer has obtained a signed account agreement from the borrower." *Id.* (citation omitted).

"In June 2001, the District Court for Montgomery County rejected Byrd's argument regarding the RCAL, and it rendered judgment in Platinum's favor in the amount of $2,322.60." *Id.* "Once more in June 2001 and then again in October 2001, the court rendered judgments in Platinum's favor of $10,600.71 and $19,269.33 on the other two accounts." *Id.*

"The first of these Maryland state court judgments was affirmed in early December 2001, after a trial de novo before the Circuit Court for Montgomery County." *Id.* Shortly thereafter, Platinum filed an involuntary Chapter 7 case against Byrd. Doc. No. 1-335 at 3. On July 17, 2002, the bankruptcy court entered an order for relief under Chapter 7 on Platinum's involuntary petition and directed Byrd to file a statement of financial affairs and schedules. Doc. No. 5-4.

"Platinum and Byrd filed cross-motions for summary judgment before the United States Bankruptcy Court for the District of Maryland." *In re Byrd*, 357 F.3d at 437. "Subsequent to the petition's filing, Byrd's appeals of the $10,600.71 and $19,269.33 judgments were also affirmed by the state circuit court." *Id.*

In the bankruptcy court, one issue for summary judgment was whether "an unstayed state court judgment that is pending appeal can constitute a 'bona fide dispute' for purposes of the Bankruptcy Code." *Id.* at 435–36 (citation omitted). The bankruptcy court granted summary judgment in favor of Platinum. Byrd appealed the bankruptcy court's decision to the district court. *See Byrd v. Platinum Financial et al.*, 8:02-cv-02675-JFM. Judge Nickerson heard Byrd's appeal to the district court. *See id.*, Doc. Nos. 10–11. In an opinion and order dated January 24, 2003, Judge Nickerson reversed the bankruptcy court, holding that Platinum's claims were the subject of a bona fide dispute. *See id.*, Doc. No. 10 at 9–10.

Platinum appealed Judge Nickerson's decision and, in an opinion issued on February 11, 2004, the Fourth Circuit Court of Appeals reversed. *See In re Byrd*, 357 F.3d 433. The Fourth Circuit remanded the case to the district court, which in turn remanded the case to the bankruptcy court on April 14, 2004. *See Byrd*, 8:02-cv-02675-JFM, Doc. No. 31. The district court entered an order denying Byrd's motion to reconsider its remand order on June 15, 2004. *See* Doc. No. 1-67.

In the meantime, the parties filed several motions and the district court issued various orders. To appreciate the import of these events, as well as the case's subsequent developments, the Court must retrace the litigation's history in somewhat closer detail. In late July 2002, the bankruptcy court ordered Byrd to file "a Statement of Financial Affairs and Schedules A through H (A through J if an individual) . . . within fifteen (15) days after entry of this Order." *In re*

3

*Ralph T. Byrd*, Bankruptcy Petition #: 01-25006, Doc. No. 152-3. On December 18, 2002, the

bankruptcy court ordered Byrd to complete several actions, inter alia: to afford the Trustee and

certain entities access to his property to inspect and secure his assets; to appear at a meeting of

creditors; and to file schedules and a statement of financial affairs. *See id.*, Doc. No. 152-4, -5.

By and large, Byrd failed to comply with these directives.

On January 24, 2003, Judge Nickerson entered his opinion and order reversing the

bankruptcy court's decision that Platinum's claims were not the subject of a bona fide dispute.

*See Byrd v. Platinum Financial et al.*, 8:02-cv-02675-JFM, Doc. No. 10 at 9–10. A few days

later, the bankruptcy court entered an order staying all maters pending the resolution of the

appeal of the district court's decision. For reasons irrelevant here, the bankruptcy court issued a

second stay order on April 15, 2003. Doc. No. 1-2.

On June 13, 2003, the trustee and Platinum filed an emergency motion requesting relief

from the bankruptcy court's stay order. The basis for this motion is somewhat involved. During

the pendency of the stay, the trustee learned that Washington Mutual Bank (Washington),

mortgage-holder on Byrd's property, had scheduled a foreclosure sale for July 2, 2003. The

trustee and Platinum asserted that if this sale was permitted to proceed, the estate's unsecured

creditors would forever lose their opportunity to be repaid from the equity in Byrd's valuable

property. The trustee and Platinum also asserted that Byrd deliberately thwarted their attempts to

gain access to the property to determine its value and equity.

One obstacle to the relief that the trustee and Platinum sought was a consent order that

the bankruptcy court approved on October 16, 2002. Doc. No. 4-98. Pursuant to 11 U.S.C. §

362(d), the consent order modified the automatic stay that Platinum's filing of the involuntary

petition had triggered.  In pertinent part, § 362 requires courts to lift automatic stays for cause,

such as where a party in interest shows a "lack of adequate protection of an interest in property." 11 U.S.C. § 362(d). Entered into by Washington, Byrd, and the trustee, the consent order provided that the continuation of the automatic stay depended on Byrd's satisfactory completion of certain mortgage payments to Washington. The consent order further provided that the automatic stay would terminate at midnight on March 31, 2003; thereafter, Washington could commence foreclosure proceedings on the mortgage lien that Byrd's property secured.

On June 30, 2003, the bankruptcy court held a hearing on Platinum and the trustee's emergency motion. The court noted that the consent order had expired on March 31, 2003 by its own terms. *In re Ralph T. Byrd*, BP # 01-25006, Doc. No. 142 at 36. The court then found "it necessary to issue an order staying the foreclosure in order to preserve assets of the estate should it be ultimately determined that the estate properly exists and is to be administered." *Id.* at 37. The court further found that "adequate protection will exist so long as and only so long as the Debtor makes the regular monthly mortgage payment." *Id.* In other words, the court ordered "that the foreclosure shall be stayed and may not be restarted unless the Debtor fails to pay, on the date due, each and every monthly payment due." *Id.* at 38.

The bankruptcy court's order granting in part Platinum and the trustee's emergency motion mostly maintained the status quo until the Fourth Circuit issued the February 11, 2004, opinion discussed above. On February 23, 2004, the trustee filed an emergency motion for relief from a prior bankruptcy stay order. On April 22, 2004, the bankruptcy court terminated a stay it had entered in April 2003. *In re Ralph T. Byrd*, BP # 01-25006, Doc. No. 169. Due to the recrudescence of the litigation, the bankruptcy court eventually held a trio of hearings to consider several matters that had arisen in the wake of the Fourth Circuit's reversal of the district court and the case's ensuing remand.

The first hearing took place on June 23, 2004. Byrd voluntarily absented himself from the hearing. From Platinum's and the trustee's standpoint,

> the general gravamen . . . is that the trustee has not been able to gain access to [the] estate property, to examine the debtor at a Section 341 meeting, and there have been no schedules filed scheduling the financial information and setting forth in a Statement of Financial Affairs the historical information required.

*See* Doc. No. 1-86 at 12. For its part, EMC Mortgage Corporation, successor-in-interest to Washington, asserted that Byrd had failed to make adequate mortgage payments in violation of the adequate protection order the bankruptcy court discussed at the June 30, 2003 hearing. Additionally, although acknowledging the role the appeals process and intervening stay orders played in delaying the case, the bankruptcy court noted Byrd's "continued failure to obey [its] prior orders." *Id.* at 61.

Based on these and other observations, the bankruptcy court took two primary actions. First, on pain of contempt, the court ordered Byrd to comply with the trustee's attempts to gain access to the estate and to produce the requested information. Second, it stayed the effect of its adequate protection order for sixty days, thereby thwarting EMC's efforts to foreclose on Byrd's property for the prescribed time. *See id.* at 57–63.

On June 25, 2004, Byrd filed an emergency motion to convert the case from Chapter 7 to Chapter 11. *In re Ralph T. Byrd*, BP # 01-25006, Doc. No. 180. In his emergency motion, Byrd asserted that the case had not been converted under sections 1112, 1208, or 1307. Byrd further asserted that, under 11 U.S.C. § 706(a), "a debtor has one absolute right to convert a liquidation case to a reorganization or individual plan." *Id.* ¶ 3 (citing *Toibb v. Radloff*, 501 U.S. 157 (1991)). The bankruptcy court granted the emergency motion on the same day. Doc. No. 1-76

The parties filed a new wave of motions in the aftermath of the June 23, 2004 hearing. On July 6, 2004, the bankruptcy court held a hearing to address these and other pertinent matters. U.S. marshals were present at the hearing. Doc. No. 1-104 at 6. Although the judge excused the marshals, the judge warned Byrd that he was "that close to being taken into custody and compelled to appear" at an impending financial examination. *Id.* The judge further warned Byrd that "[i]f you don't appear, you will be apprehended." *Id.*

The central purpose of the hearing was to address emergency motions to convert the case from Chapter 11 to Chapter 7 filed by Platinum and the U.S. trustee. The primary basis for these motions was that 11. U.S.C. § 546's two-year deadline for commencing avoidance proceedings under 11 U.S.C. § 548 was set to expire on July 17, 2004. Doc. No. 1-104 at 9. In essence, the bankruptcy court deferred ruling on these motions. In coming to this conclusion, the court noted that certain prospects boded ill for the creditors' chances of obtaining adequate relief, including: (1) "any uninsured risk of the estate's property"; (2) "the looming statutory deadline for avoidance"; and (3) "the threat of foreclosure." *Id.* at 44. These time threats notwithstanding, the bankruptcy court basically ordered Byrd to facilitate access to his property and produce the requested financial information in a limited time frame.

The July 6, 2004 hearing resumed on July 14, 2004. The bankruptcy court heard testimony and took evidence from Platinum, the trustee, and the U.S. trustee. The trustee provided most of the relevant testimony. The trustee testified that, although his inspection revealed some meaningful efforts to satisfy the outstanding mortgage payments, Byrd was still in arrears. *See* Doc No. 1-98 at 27–28, 48. The trustee also testified that the documentation Byrd produced indicated that Byrd had conducted various avoidable transactions. *See id.* at 16–27. The trustee further declared that the schedules the bankruptcy court ordered Byrd to produce were

incomplete. *Id.* at 38. Additionally, the trustee testified that his inspection of Byrd's property revealed that it was in "terrible condition." *Id.* (internal quotation marks omitted). The trustee added that Byrd had yet to file or propose a reorganization plan and that he had not discussed options for refinancing his mortgage with EMC. *Id.* at 30.

Byrd offered declarations and evidence to rebut the creditors' factual and legal contentions. Byrd basically made a two-part argument: (1) there was no cause for converting the case to a Chapter 7 proceeding; and (2) it would be improper to appoint a Chapter 11 trustee. Byrd predicated these arguments on the assertion that the property had adequate equity to cover his liabilities. To support this assertion, Byrd offered the testimony of a real estate appraiser who valued the property at around $700,000. *See id.* at 55–56.

The bankruptcy court's decision amounted to a middle ground. For the time being, the court declined to convert the case to a Chapter 7 proceeding. However, much to Byrd's chagrin, the court sua sponte ordered the appointment of a Chapter 11 trustee. *See id.* at 77–82. In reaching this conclusion, the court noted the presence of "two potential imminent and devastating time threats to the realization by the estate of assets which may be necessary to pay creditors." *Id.* at 77. The first was the court's June 23, 2004 order staying the effect of its June 30, 2003 adequate protection order for sixty days. *See id.* at 77–78. In the court word's, "that clock is running." *Id.* at 78. The "avoidance actions" were the second threat. *Id.* at 79. Regarding these threats, the court wrote that, even though the appraiser valued Byrd's property at $700,000, there was no reasonable guarantee that the property would sell in this "limited time frame." *Id.* at 78. The court further noted that the trustee's evidence regarding the property's poor condition cast doubt on the idea that it would "show well." *Id.* at 79. The court also observed that there had

8

been questionable transfers from the estate and that Byrd had manifested reluctance to market the property. *Id.* at 80. Accordingly, the court concluded that

> to protect the estate the Court cannot leave Mr. Byrd as the Debtor in possession solely responsible and solely having the power to do those acts to protect these assets, i.e., to immediately aggressively market the property. And to immediately to the extent that it seems appropriate . . . file such actions that would stop limitations from running.

*Id.* In short, in declining to convert the case from Chapter 11 and by appointing a Chapter 11 trustee, the bankruptcy court sought to balance the creditors' interest in protecting "the estate from potential imminent loss" with "the opportunity . . . [for] Mr. Byrd to attempt to reorganize." *Id.*

On July 26, 2004, Byrd filed an emergency motion to reconsider the July 14 order appointing the Chapter 11 trustee. Doc. No. 1-99. On August 27, 2004, the bankruptcy court denied Byrd's motion to reconsider. Doc. No. 1-138.

## III.    STANDARD OF REVIEW

A bankruptcy court's factual findings are reviewed for clear error. *In re Litton*, 330 F.3d 636, 642 (4th Cir. 2003). Its conclusions of law, in contrast, are reviewed de novo. *Id.*  Mixed questions of law and fact are also reviewed de novo. *Id.*

## IV.    LEGAL ANALYSIS

### A.    The bankruptcy court committed no error in sua sponte appointing the Chapter 11 trustee

Byrd contends that the bankruptcy court erred in its July 14, 2004 order sua sponte appointing the Chapter 11 trustee and in denying his emergency motion to reconsider the same or to postpone appointment of the Chapter 11 trustee pending review by the district court. Byrd makes a two-pronged attack. First, Byrd asserts that "[t]he circumstances relied upon by the

Bankruptcy Court to justify the appointment of a Chapter 11 Trustee did not exist." Br.

Appellant 14, Doc. No. 10. In other words, Byrd contests the accuracy of the bankruptcy court's

factual findings. Alternatively, Byrd maintains that, even if the bankruptcy court's factual

findings were not erroneous, they were insufficient to warrant the Chapter 11 trustee's

appointment. Byrd's argument does not stand up under scrutiny.

> 1.    *The factual findings on which the bankruptcy court relied to sua sponte appoint
>        the Chapter 11 trustee are not clearly erroneous*

Byrd contests the validity of two of the "circumstances" on which the bankruptcy court

relied in rendering its July 14, 2004 order. First, Byrd insists that the bankruptcy court relied on

the October 16, 2002 adequate protection order even though the latter, by its terms, would not

survive the conversion of the case to another Chapter. *See* Doc. No. 4-98 ¶ 6. Byrd then notes

that the case was converted to Chapter 11 on June 25, 2004, which date falls before July 14,

2004. Consequently, in Byrd's estimation, the court relied on "nonexistent authority as the

irresistible force compelling the bankruptcy court's perception of the existence of an emergency

requiring the immediate appointment of a Chapter 11 Trustee." Br. Appellant 16, Doc. No. 10.

Second, Byrd attacks the bankruptcy court's alleged determination that the foreclosure

was set to take place in August 2004. Byrd insists that the foreclosure was not scheduled to take

place until November 2004. Considering that the case was converted to Chapter 11 on June 25,

2004, Byrd avers that the November 2004 foreclosure date was sufficient to accommodate the

120-day exclusive period under 11 U.S.C. § 1121(b).[1]

Byrd's argument is flawed in several respects. The October 16, 2002 order was not the

primary factor compelling the bankruptcy court's determination that its sua sponte appointment

---

[1] Section 1121(b) provides as follows: "Except as otherwise provided in this section, only the debtor may
file a plan until after 120 days after the date of the order for relief under this chapter." 11 U.S.C. §
1121(b).

of a Chapter 11 trustee was necessary and proper. During the July 14, 2004 hearing, the court noted the presence of "two potential imminent and devastating time threats." Concerning the threat that the statutorily prescribed two-year limitations period for avoidance actions would expire, the bankruptcy court determined that the appointment of a Chapter 11 trustee might be necessary to obviate this eventuality. In making this finding, the court explicitly stated that the former Chapter 7 trustee's testimony demonstrated that "there had been transfers that at least raised questions." Doc. No. 1-98 at 80. Byrd has failed to rebut these findings and they are not clearly erroneous.

As for the impending threat of foreclosure, the bankruptcy court declared at the July 14, 2004 hearing that the sixty-day clock that its June 24, 2004 order memorializing the findings of its June 23, 2004 hearing set was running. Byrd, in essence, argues that the June 24, 2004 order staying foreclosure efforts by EMC failed to set a clock because it incorporated the terms of the October 16, 2002 adequate protection order. As discussed above, the October 16, 2002 adequate protection order provided that Washington, EMC's predecessor-in-interest, could commence foreclosure proceedings on the mortgage lien that Byrd's property secured on March 31, 2003. After this time, the October 16, 2002 adequate protection order authorized Washington to "commence and complete foreclosure proceedings on its mortgage lien secured by [Byrd's property]." Doc. No. 4-98 ¶ 5. By its terms, the October 16, 2002 adequate protection order did not "survive the conversion of [the] case to a case under a different chapter." *Id.* ¶ 6. Therefore, Byrd asserts that the bankruptcy court's conversion of the case to Chapter 11 on June 25, 2004 vitiated the force of the October 16, 2002 adequate protection order. Consequently, Byrd argues, the June 24, 2004 order set no such clock.

This argument constitutes an unduly restrictive view of the bankruptcy court's findings. The bankruptcy court declared at the July 14, 2004 hearing that the sixty-day clock that its June 24, 2004 order set was running. The June 24, 2004 order memorializes the reasons that the bankruptcy court stated on the record at the June 23, 2004 hearing. *See* Doc. No. 1-65 at 1. At said hearing, the bankruptcy court received testimony from Washington that Byrd had failed to make adequate mortgage payments in contravention of the terms of the court's June 30, 2003 adequate protection order. *See* Doc. No. 1-86 at 20–21. Based partly on these observations, the bankruptcy court stayed the effect of its June 30, 2003 adequate protection order for sixty days. *Id.* at 63. It is certain that the bankruptcy court stayed the June 30, 2003 order because Washington's testimony related to the June 30, 2003 order. Furthermore, in so deciding, the bankruptcy court explicitly cited "pleading 143," which designates the court's July 15, 2003 order memorializing the terms of the June 30, 2003 hearing. *See id.* (citing *In re Ralph T. Byrd*, BP # 01-25006, Doc. No. 143).

Thus, in contrast to Byrd's narrow focus on the validity of the October 16, 2002 adequate protection order, the true inquiry is whether the June 30, 2003 adequate protection order is valid. As explained above, in the June 30, 2003 hearing, the court noted that the consent order had expired on March 31, 2003 by its own terms. The court went on to find that adequate protection will exist only so long as Byrd made the regular monthly mortgage payment. Byrd does not contest the validity of these findings. Therefore, Byrd inaccurately asserts that the bankruptcy court relied on "nonexistent authority as the irresistible force compelling [its] perception of the existence of an emergency requiring the immediate appointment of a Chapter 11 Trustee." Quite the contrary, the bankruptcy court based its determinations at the June 23, 2004 hearing on an accurate assessment of the record, including the effect of its June 30, 2003 order. Thus, as the

June 24, 2004 order whose validity Byrd contests memorializes the findings of the June 23, 2004 hearing, the bankruptcy court's offhand reference to the then-expired October 16, 2002 order is immaterial.

One can condense the preceding analysis into two broad propositions. First, the bankruptcy court relied on an accurate assessment of the record, including the effect of its prior orders, when it issued the July 14, 2004 order appointing a Chapter 11 trustee. Second, there was no single "irresistible force" compelling the bankruptcy court's determination that the appointment of a Chapter 11 trustee was kosher. Rather, the bankruptcy court took into account an array of circumstances, including the looming deadline for avoidance actions and Byrd's persistent failure to comply with prior court orders. Accordingly, the factual findings imbuing the bankruptcy court's July 14 order sua sponte appointing the Chapter 11 trustee are not clearly erroneous.

2.    *The factual findings upon which the bankruptcy court relied to sua sponte appoint the Chapter 11 trustee sufficed to warrant such appointment*

Chapter 11 generally contemplates giving the "debtor the opportunity to reorganize and rehabilitate." *In re Raymond Prof'l Grp., Inc.*, 421 B.R. 891, 909 (Bankr. N.D. Ill. 2009) (citation omitted). Consistent with this general rule, 11 U.S.C. § 1121(b) pertinently provides that "only the debtor may file a plan until after 120 days after the date of the order for relief under [Chapter 11]." 11 U.S.C. § 1121(b).

Section 1121's exclusivity period, however, is not absolute. *In re Mother Hubbard, Inc.*, 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993). Section 1104 requires bankruptcy courts to appoint a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause." 11 U.S.C. § 1104(a), (1). Yet Section 1104 conditions bankruptcy

courts' requirement to appoint a Chapter 11 trustee on, inter alia, a "request of a party in interest or the United States trustee." *Id.* § 1104(a).

Nevertheless, § 1104 does not preclude bankruptcy courts from appointing a Chapter 11 trustee sua sponte. Acting as a counterweight to Chapter 11's general presumption in favor of debtor reorganization and rehabilitation, § 105 provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105 goes on to specify that

> [n]o provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, **sua sponte**, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

*Id.* (emphasis added). Thus, "[t]he plain language of the Code . . . is that Section 105 authorizes the Court sua sponte to take such action." *First Am. Health Care of Ga., Inc. v. U.S. Dep't of Health and Human Servs.*, 208 B.R. 992, 994 (Bankr. S.D. Ga. 1996). The vast weight of the authority supports this view. *See id.* (citing cases). Although there are a few cases to the contrary, courts decided most of these cases before Congress amended § 105(a) in 1986 to add the critical language concerning bankruptcy courts' power to act sua sponte. *In re Mother Hubbard*, 152 B.R. at 197 n.18; *see In re Great Am. Pyramid Joint Venture*, 144 B.R. 780, 789 (Bankr. W.D. Tenn. 1992).

There is no bright-line test for determining when § 105(a) authorizes courts to sua sponte appoint a Chapter 11 trustee. Nevertheless, courts have read § 105(a) in pari materia with § 1104 and determined that the latter's "for cause" standard may warrant the sua sponte appointment of a Chapter 11 trustee. *See First Am. Health*, 208 B.R. at 994; *In re Mother Hubbard*, 152 B.R. at 196–97. Section 1104 embodies a nonexhaustive list of "cause," including "fraud, dishonesty,

**incompetence**, or **gross mismanagement** of the affairs of the debtor by current management, either before or after the commencement of the case, **or similar cause**." 11 U.S.C. § 1104(a)(1) (emphases added). Likewise, § 105(a)'s literal language compels the conclusion that courts may sua sponte appoint a Chapter 11 trustee "to prevent an abuse of process." 11 U.S.C. § 105(a); *First Am. Health*, 208 B.R. at 994; *In re Mother Hubbard*, 152 B.R. 189, 197. Determining whether sufficient cause or an abuse of process exists "is a fact-intensive inquiry that lies within discretion of the judge." *Cf. In re Raymond*, 421 B.R. at 909 (citation omitted).

In this case, the bankruptcy judge committed no error in determining that there was cause to sua sponte appoint a Chapter 11 trustee. The facts recounted above show that the judge had good reason to believe that Byrd had abused the bankruptcy process. The facts further show that the judge had adequate grounds to conclude that Byrd had grossly mismanaged the estate or, alternatively, lacked competence to manage it properly. At the June 24, 2004 hearing, the bankruptcy court noted Byrd's continued failure to obey its prior orders. Byrd's dilatory and obstructive tactics grew so insufferable that the bankruptcy court ordered marshals to attend the July 6, 2004 hearing and explicitly warned Byrd that he was "that close" to being taken into custody. At the July 14, 2004 hearing, the trustee submitted, and the court credited, evidence that Byrd had (1) left the property in poor condition, (2) made questionable transfers, and (3) manifested reluctance to market the property. Additionally, the bankruptcy judge laid considerable emphasis on the looming deadlines that threatened the debtors' prospects of recovery. Assuming arguendo these circumstances failed to constitute incompetence or gross mismanagement, they would nevertheless arise to "similar cause." They similarly point to an abuse of the bankruptcy process. Perhaps this should come as no surprise considering that Byrd was subsequently sanctioned and disbarred for his abusive practices. Moreover, to mitigate any

15

harm that might arise from its sua sponte appointment of a Chapter 11 trustee, the bankruptcy court kept the case in Chapter 11 and expressly authorized Byrd to submit a reorganization plan of his own choosing. Byrd counters that "the stigma of the appointment of a Chapter 11 Trustee . . . undermined his efforts to actively seek a refinancing loan as part of a proposed reorganization plan and precluded any efforts to attempt to obtain a Debtor-In-Possession loan from a bank." Br. Appellant 20, Doc. No. 10. Yet Byrd offers nothing more than the averments in his appellant's brief to support this vague and speculative argument. *See id.* n.6. Nor does Byrd pinpoint any other harm that the bankruptcy court's sua sponte appointment purportedly caused. Accordingly, under all the circumstances, the bankruptcy judge did not err in sua sponte appointing a Chapter 11 trustee.

**B.      The bankruptcy court committed no error when it approved $351,622.51 in total administrative expenses**

> *1.      Facts related to argument that administrative expenses were improper*

As recounted above, one can trace this dispute to credit card debt that Byrd owed to, among other entities, Platinum. Platinum filed separate Maryland state court actions to collect this debt. Between June and October 2001, the District Court for Montgomery County rendered judgment in Platinum's favor in the separate actions.

Platinum was represented by Ronald S. Canter of Wolpoff & Abramson in at least some of these state court actions. Platinum is, or at least at the time was, "controlled by principals of Wolpof[f] & Abramson, a collections law firm." *Attorney Grievance Comm'n of Md. v. Byrd*, 970 A.2d 870, 876 (Md. 2009). According to Byrd, "Harry K. Wolpoff and Ronald M. Abramson (also partners in the law firm Wolpoff & Abramson) were Platinum's president and secretary, respectively." Br. Appellant 21, Doc. No. 10.

The first of these Maryland state court judgments was affirmed in December 2001 by the Circuit Court for Montgomery County. Around this time, Byrd filed a class action complaint against, inter alios, Platinum. In the same month, Platinum initiated the involuntary Chapter 7 proceeding against Byrd. Platinum was represented by Shulman Rogers Gandal Pordy & Ecker, P.A. (Shulman Rogers) when it filed the involuntary petition. Doc. No. 4-1 at 2.

On July 17, 2002, two significant developments transpired. One, the bankruptcy court entered an order for relief under Chapter 7 on Platinum's involuntary petition and directed Byrd to file a statement of financial affairs and schedules. Doc. No. 5-4. Two, Roger Schlossberg was appointed as the Chapter 7 trustee. Doc. No. 4-74.

On August 26, 2002, another pair of consequential developments occurred. First, the Chapter 7 trustee filed an application to employ James Hoffman and Shulman Rodgers as special counsel. Doc. No. 4-79. Second, Platinum filed a motion to substitute Ronald S. Canter of Wolpoff & Abramson for Shulman Rodgers. *In re Byrd*, BP # 1-25006, Doc. No. 76.

Byrd opposed the Chapter 7 trustee's application. Doc. No. 4-81. Evidently, Byrd argued that the Chapter 7 trustee and special counsel "would be in the untenable position of having to act against Platinum (by possibly taking control of the class action against Platinum) and on behalf of Platinum (by continuing to prosecute the involuntary bankruptcy proceeding against Ralph Byrd) all in the same proceeding." Br. Appellant 26, Doc. No. 10.

On October 30, 2002 or thereabouts, the Circuit Court for Montgomery County dismissed Byrd's class action complaint against Platinum. Approximately one month later, Byrd appealed this decision to Maryland's Court of Special Appeals for the Circuit Court for Montgomery County.

On December 2, 2002, the bankruptcy court held a hearing on, inter alia, the Chapter 7 trustee's application to employ Hoffman and Shulman Rodgers as special counsel. Characteristically, Byrd did not attend the hearing. *See* Doc. No. 12 at 4; *see also* Doc. No. 1-335 at 7 (noting Byrd's practice of "filing summary objections . . . then failing to appear at the hearing to prosecute the objection"). During the hearing, Hoffman testified about the "difficulty [of the] administration of [the] case so far," and that "[they] [had] not received the Debtor's assistance in the case." Doc. No. 12 at 5–6. Likewise, the bankruptcy court declared that Byrd has "no excuse for [his] failure to [file] [his] schedules, statement of financial affairs, and . . . to attend the [§] 341 meeting." *Id.* at 11. The bankruptcy judge further stated that "[t]he Debtor's bald assertion that the pendency of the appeal, in effect, deprives the Court of its jurisdiction, and relieves the Debtor of his responsibility as a Debtor under Chapter 7 in regard to filing schedules, a statement of financial affairs, and attending a 341 meeting, is incorrect." *Id.*

Beyond that, the bankruptcy court considered Hoffman's argument concerning the propriety of appointing him and Shulman Rodgers as special counsel. *See id.* at 4–6. As previously stated, Hoffman discussed Byrd's efforts to frustrate the administration of the estate. Furthermore, while acknowledging that special counsel figured to play a significant role in the administration of the case, Hoffman stressed that special counsel would not handle matters "directly against" Platinum. *See id.* at 4, 6. In light of the foregoing, the bankruptcy judge granted the application to employ Hoffman and Shulman Rogers as special counsel. *Id.* at 6. The bankruptcy court memorialized its ruling at the December 2, 2002 hearing in a December 6, 2002 order. *See In re Byrd*, BP # 01-25006, Doc. No. 103.

After the Fourth Circuit rendered its February 11, 2004 decision, Platinum, represented by Canter, filed a motion in the Maryland Court of Special Appeals to substitute the Chapter 7

trustee as the real party in interest in the appeal of the dismissal of Byrd's class action complaint. More months of motions practice passed and, on the heels of the June 23, 2004 hearing, Byrd filed an emergency motion to convert the case from Chapter 7 to Chapter 11, which the bankruptcy court summarily granted. As a consequence, the Chapter 7 trustee lost his status as Chapter 7 trustee. Responsively, on July 14, 2004, the bankruptcy court ordered the appointment of a Chapter 11 trustee. Doc. No. 1-89. A week later, the bankruptcy court approved the appointment of Gregory P. Johnson as Chapter 11 trustee. Doc. No. 1-97.

On August 19, 2004, Byrd filed a motion, among other things, to strike the appointment of the Chapter 11 trustee, arguing in part that he was conflicted. Doc. No. 1-131. On August 30, 2004, the Maryland Court of Special Appeals affirmed the Circuit Court's dismissal of Byrd's class action complaint against Platinum. On the same day, the Chapter 11 trustee filed an application to employ Hoffman and Shulman Rogers as special counsel nunc pro tunc. Doc. No. 1-139. On the same day, the bankruptcy court held a hearing on, inter alia, Byrd's motion to strike the appointment of the Chapter 11 trustee. Doc. No. 1-144.

At the hearing, the bankruptcy court considered the declarations of several parties, including the Chapter 11 trustee and the U.S. Trustee. The Chapter 11 trustee stated that he talked to Byrd as a part of his duty to preserve and maintain the assets of the estate. According to the Chapter 11 trustee, when he asked Byrd about his plan for reorganization, Byrd conceded that he was still in default on his first mortgage and that he had not paid the second mortgage since 1999. *See id.* at 48–49. The Chapter 11 trustee also determined that Byrd's class actions offered him little promise of financial gain considering that Byrd had lost the majority of them and they were in the appeals process. *See id.* at 49–50. The Chapter 11 trustee's examination of Byrd's schedules cast a darker cloud over his financial prospects in that it showed a gross income

in the $20,000 range over a three- to four-year period. *See id.* at 50–51. For these reasons, the

Chapter 11 trustee concluded that the property was Byrd's only viable assert. *See id.* at 51–52.

Moreover, the Chapter 11 trustee noted the substandard condition of the property and the

impending threat of foreclosure. *See id.* at 51–52. Accordingly, the Chapter 11 trustee concluded

that liquidation of the property was the only viable means of preserving the estate's assets and

satisfying Byrd's creditors. *See id.* For its part, the U.S. trustee stated that the Chapter 11 trustee

had properly acted to investigate Byrd's financial affairs. *See id.* at 53.

In light of the foregoing, the bankruptcy judge denied Byrd's motion to strike the

appointment of the Chapter 11 trustee. *Id.* at 60. In so doing, the bankruptcy court specifically

rejected Byrd's argument that the Chapter 11 trustee had behaved improperly. *Id.* at 58. The

bankruptcy judge downplayed Byrd's conflict-of-interest argument as "a difference of opinion as

to how the Trustee should proceed." *See id.*

In the same hearing, the bankruptcy judge issued two more apposite rulings. First, he

rejected Byrd's argument that the court should strike certain pleadings that Hoffman and

Shulman Rogers filed on behalf of the Chapter 11 trustee even though they had not officially

been appointed as the Chapter 11 trustee's counsel. *See id.* at 65. Second, the court deferred

ruling on Byrd's argument that the court should strike the appointment of the former Chapter 7

trustee and his special counsel, Hoffman and Shulman Rogers. In deferring ruling on this

question, the court observed that the Chapter 7 trustee's role as trustee terminated upon the

conversion of the case to Chapter 11. Therefore, the court concluded that it would properly

address the propriety *vel non* of the Chapter 7 trustee's appointment in the context of "what, if

any, remuneration should be allowed." *Id.* at 63; *see also id.* at 61.

20

On September 7, 2004, the bankruptcy court entered an order memorializing the findings

it made at the August 30, 2004 hearing. In this order, the bankruptcy court clarified its reasons

for deferring ruling on Byrd's argument that the court should strike the appointment of the

former Chapter 7 trustee nunc pro tunc. The court explained:

> As to the request in the debtor's motion to strike the appointment of the Chapter 7
> Trustee and counsel to the Chapter 7 Trustee, the intent of these prayers for relief
> is to object to compensation and expenses for which the former Chapter 7 Trustee
> has or may apply. As the Chapter 7 Trustee ceased to be a Trustee upon the
> conversion of this case to a case under Chapter 11, there is no appointment to
> strike. Similarly, the engagement by the Chapter 7 Trustee of counsel ended at the
> time of conversion to Chapter 11. To the extent that oppositions are filed to any
> applications for compensation or reimbursement, it will be considered.

Doc. No. 1-142 at 2.

On October 5, 2004, the bankruptcy court issued an order authorizing the employment of

Shulman Rogers and Hoffman as special counsel for the Chapter 11 trustee. Doc. No. 1-175. In

this order, the court wrote that it was

> satisfied that Shulman Rogers represents no interest materially adverse to the
> Chapter 11 Trustee or the estate in the matters upon which it is to be engaged, and
> that the employment of Shulman Rogers is necessary and would be in the interests
> of the estate, and that the case is one justifying a general retainer.

*Id.* at 1. In the order's first decretal paragraph, the bankruptcy court placed the following

limitations on the appointment: "(i) claims against Platinum and transactions

between Platinum and the bankruptcy estate; (ii) representing the trustee in conducting

the case; and (iii) representing or assisting the trustee in carrying out the trustee's duties

under this title . . . ." *Id.* at 2.

On October 13, 2004, the Chapter 11 trustee filed an application to employ his own law

firm, Orem and Johnson, as general counsel to himself and in his capacity as the Chapter 11

trustee. *In re Byrd*, BP # 01-25006, Doc. No. 316. On November 4, 2004, the bankruptcy court issued an order approving the Chapter 11 trustee's application. Doc. No. 1-201.

On November 11, 2004, Beverly Byrd, Ralph Byrd's wife, filed a voluntary Chapter 13 bankruptcy petition. *In re Byrd*, Bankruptcy Petition #: 04-35620, Doc. No. 1. On January 13, 2005, the bankruptcy court substantively consolidated Ms. Byrd's bankruptcy petition with Mr. Byrd's. *In re Byrd*, BP # 04-35620, Doc. No. 49. On January 23, 2005, the Chapter 11 trustee and Shulman Rogers filed a motion to convert the case under Chapter 7. The case went on for a year, at the end of which the bankruptcy court denied the Byrds' Chapter 13 plan. *Id.*, Doc. No. 198. On March 20, 2006, the bankruptcy court entered an order granting the Chapter 11 trustee's motion to convert the case to a case under Chapter 7. *Id.*, Doc. No. 249. On April 3, 2006, the bankruptcy court appointed Johnson (the former Chapter 11 trustee) as the new Chapter 7 trustee.

On June 29, 2006, the new Chapter 7 trustee filed a motion to authorize the appointment of Shulman Rogers as special counsel for the estate. *Id.*, Doc. No. 332. The bankruptcy court treated this motion as an application under 11 U.S.C. § 327 and Bankruptcy Rule 2014 "to retain Shulman Rogers as of the date of conversion of this case to Chapter 7." *Id.*, Doc. No. 386 at 40. The bankruptcy court proceeded to hold a hearing on, inter alia, this motion on August 15, 2011, which the court continued to August 21 of the same year. *Id.*, Doc. Nos. 378, 386.

At the August 15 hearing, the bankruptcy court took the testimony of Hoffman and Canter. Hoffman testified that, to his knowledge, Shulman Rogers did not represent Platinum after the bankruptcy court entered the July 17, 2002 order for relief. *Id.*, Doc. No. 378 at 52. During his cross-examination of Hoffman, Byrd pointed out that Hoffman had stated in two affidavits, one as late as August 30, 2004, that Shulman represented Platinum. *See id.* at 39, 55–

56. Hoffman responded that he made such representations "out of an abundance of caution for full disclosure . . . that we previously represented Platinum and we did not . . . send a letter saying that representation terminated . . . ." *Id.* at 56.

Canter testified regarding the nature and extent of Wolpoff and Abramson's relationship with Platinum. Canter stated that Platinum went to Wolpoff for advice concerning collecting on the state court judgments it held against Byrd for delinquent credit card payments. *Id.* at 63. Canter further stated that Wolpoff and Platinum were aware of a pending foreclosure on Byrd's property. *See id.* In Canter's view, Wolpoff determined that instituting an involuntary bankruptcy was the most advisable course of action considering that (1) "the 90 day preference period had not yet elapsed" and (2) Platinum was an unsecured creditor. *See id.* at 63–64. In short, "the theory [was] that the [t]rustee would get more for the property than the foreclosure sale." *Id.* at 64. Furthermore, Canter testified that he suggested to Platinum that it hire Shulman to prosecute the involuntary petition as Canter "had never done one before." *Id.* at 64. Canter added that Shulman Rogers ceased to represent Platinum upon the entry of the July 17, 2002 order for relief. *Id.* at 65.

The bankruptcy court continued the hearing to August 21, 2006. At this segment of the hearing, the bankruptcy court heard closing arguments, after which it issued findings of fact and conclusions of law. The bankruptcy court found Canter's testimony "highly credible," wherefore it accepted it "in its entirety." *Id.*, Doc. No. 386 at 41. The bankruptcy court further found that "[t]he evidence at the hearing was clear that Shulman Rogers ha[d] not represented Platinum since" roughly one month after the entry of the July 17, 2002 order. *See id.* at 42. As for its legal conclusions, the primary issue was whether Shulman Rogers met the requirements of 11 U.S.C. § 327 to legitimize the new Chapter 7 trustee's retention of it. *Id.* at 48. In a nutshell, the

bankruptcy court ultimately concluded that Shulman Rogers was not conflicted. *See id.* at 48–67. As a result, the court approved the motion to authorize the appointment of Shulman Rogers as special counsel for the estate. *Id.* at 66–67.

> 2.    *Legal analysis regarding alleged conflicts of interest*

Byrd makes a series of arguments whose gravamen is that Shulman Rogers was conflicted and, therefore, the bankruptcy court erred in approving its application to serve as special counsel. Consequently, Byrd contends that the bankruptcy court improperly awarded certain administrative expenses. Like everything else about this case, the arguments Byrd makes in support of this theory of relief are quite disjointed. Therefore, the Court will briefly set forth the applicable legal principles and proceed to address Byrd's meandering arguments, more or less, in seriatim.

> a.    Legal background

"Section 330(a) of the Bankruptcy Code governs the compensation of professional persons employed by the trustee, estate, or debtor-in-possession in a bankruptcy action." *In re Johnson*, 312 B.R. 810, 817 (E.D. Va. 2004). "Specifically, it provides that: 'The [bankruptcy] court may award . . . to a professional person employed under section 327 or 1103 of this title . . . reasonable compensation for actual, necessary services rendered by such . . . professional person, or attorney . . . and reimbursement for actual, necessary expenses.'" *Id.* (quoting 11 U.S.C. § 330(a)). "As the terms of § 330 make clear, an attorney or other professional person employed by a trustee is not entitled to compensation under § 330(a) unless that individual or firm is validly employed under § 327." *Id.*

"Section 327 governs bankruptcy court approval of a trustee's employment of attorneys and other professionals." *Id.* at 818. Section 327 "accords the bankruptcy court broad discretion

in approving the employment of professionals." *Id.* at 819. Consonant with this discretion, §

327(a) provides as follows:

> **Except as otherwise provided in this section**, the trustee, with the court's
> approval, may employ one or more attorneys, accountants, appraisers,
> auctioneers, or other professional persons, that do not hold or represent an interest
> adverse to the estate, and that are disinterested persons, to represent or assist the
> trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a) (emphasis added). In other words, § 327 embodies an exception to the

general rule that courts may approve a trustee's employment of an attorney or firm "only if that

individual or firm (i) does not hold or represent an interest adverse to the estate and (ii) is

disinterested." *Compare In re Johnson*, 312 B.R. at 819 (citing 11 U.S.C. § 327(a)), *with id.*

(citing 11 U.S.C. § 327(c)). In relevant part, § 327(c) provides that

> a person is not disqualified for employment under this section solely because of
> such person's employment by or representation of a creditor, unless there is
> objection by another creditor or the United States trustee, in which case the court
> shall disapprove such employment if there is an actual conflict of interest.

11 U.S.C. § 327(c). Thus, "a trustee may employ a creditor's attorney under § 327(c) provided

the dual representation presents no actual conflict of interest." *In re Johnson*, 312 B.R. at 820.

"[T]his is so even if there exists a potential conflict of interest or an appearance of a conflict of

interest that would otherwise disqualify the attorney from employment under § 327(a)." *Id.*

"The term 'actual conflict of interest' is not defined in the Bankruptcy Code." *Id.* at 822

(citing *In re BH & P, Inc.*, 949 F.2d 1300, 1315 (3d Cir. 1991)). "Instead, the term 'has been

given meaning largely through a case-by-case evaluation of particular situations in the

bankruptcy context.'" *Id.* (quoting *In re BH & P*, 949 F.2d at 1315). "In this regard, '[c]ourts

have been accorded considerable latitude in using their judgment and discretion in determining

whether an actual conflict exists in light of the particular facts of each case.'" *Id.* (some internal

quotation marks omitted) (quoting *In re BH & P*, 949 F.2d at 1315). In other words, "courts have

declined to set forth bright line rules as to when an alleged conflict warrants disqualification under § 327(c)." *Id.* (citing *In re BH & P*, 949 F.2d at 1315).

One can distill the following standard from these principles. "[A]n alleged conflict of interest is 'actual' and warrants disqualification under § 327(c) if there is 'active competition between two interests, in which one interest can only be served at the expense of the other.'" *Id.* (quoting *In re BH & P*, 103 B.R. 556, 563 (Bankr. D.N.J. 1989)). "Accordingly, where . . . an attorney is employed by both the trustee and a creditor, there is no 'actual conflict of interest' warranting disqualification unless (i) the interests of the trustee and the creditor are in fact directly conflicting or (ii) the creditor is actually afforded a preference that is denied to other creditors." *Id.* at 822 (footnote omitted). Furthermore, "[a] conflict 'in which the competition is presently dormant, but may become active if certain contingencies occur,' is merely potential and thus does not warrant disqualification." *Id.* (quoting *In re BH & P*, 103 B.R. at 563).

b.      Specific arguments of the debtor

Byrd's first theory of relief is that the bankruptcy court erred in its December 6, 2002[2] order granting the Chapter 7 trustee's application to employ Hoffman and Shulman Rogers as special counsel. Br. Appellant 45, Doc. No. 10. Byrd argues that this decision was improper for several reasons. The principal reason is that Shulman Rogers represented Platinum in its prosecution of the involuntary petition.  Relatedly, Byrd asserts that the Trustee "ha[s] a duty to maximize the bankruptcy estate through the <u>collection</u> of any claims [Byrd] had against[] Platinum." *Id.* at 47 (emphasis in original). Byrd also notes that the application for Shulman's employ as special counsel was broad, comprehending most activities other than those directly against Platinum. Moreover, according to Byrd, Shulman continued to represent Platinum in

_____

[2] The December 6, 2002 order simply memorializes the bankruptcy court's ruling at the December 2, 2002 hearing, which Byrd failed to attend, and which the Court discussed above.

other matters when the bankruptcy court issued the December 6, 2002 order. Finally, Byrd characterizes Platinum's bankruptcy litigation as "steroidal." *Id.* at 48. Owing to these considerations, Byrd insists that Shulman Rogers had an actual conflict of interest between its duty to the Chapter 7 trustee and its duty to Platinum.

This argument is meritless. As the bankruptcy court found at the August 21, 2006 hearing, Shulman stopped representing Platinum shortly after the July 17, 2002 order for relief and maintained no further contact with it. Based on the testimony that was presented at the August 15, 2006 hearing, this Court sees no reason to disturb this factual finding. Therefore, it is somewhat disingenuous to assert that Platinum, as creditor, employed Shulman Rogers. This is especially the case because (1) the bankruptcy court found that Platinum sought Shulman Rogers's aid for the express and sole purpose of prosecuting the involuntary petition and (2) the case dragged on for a seemingly interminable amount of time. In the stormy sea of litigation into which the case devolved, Shulman Rogers and Platinum were like two ships passing in the night. Thus, as a threshold matter, it is unclear to the Court that Shulman Rogers is interested within the meaning of § 327(a).

Even assuming Shulman bore some baseline level of interest sufficient to cross § 327(a)'s threshold, § 327(c) still authorizes courts to approve the trustee's appointment of a person or firm that represents a creditor. Pertinently, § 327(c) provides that "a person is not disqualified for employment . . . unless there is objection by another creditor or the United States trustee." 11 U.S.C. § 327(c). In this case, as the bankruptcy court noted at the August 21 hearing, neither a creditor nor the U.S. trustee has objected to Shulman's representation of the Chapter 7 trustee. Therefore, by § 327(c)'s plain meaning, Byrd, as debtor, would appear to lack standing to object

to the appointment and approval of Shulman Rogers as special counsel for the Chapter 7 trustee. *See In re Byrd*, BP # 04-35620, Doc. No. 386 at 54–55.

Yet Byrd's argument would fail even if he had such standing; the facts of this case fail to reveal that Shulman's interests actually conflicted with those of the Chapter 7 trustee. Through the multitude of filings and hearings that this case subsumes, Byrd has repeated ad nauseam his belief that, inconsistent with the Chapter 7 trustee's duties, Shulman had a concrete disincentive to maximize the value of the estate because Byrd had sued Platinum, its former client, in state court.

This argument presupposes that Byrd's state court claims had value. However, as discussed above, the Circuit Court for Montgomery County dismissed Byrd's class action complaint against Platinum on or around October 30, 2002. Then, on or around August 30, 2004, the Maryland Court of Special Appeals affirmed the Circuit Court's dismissal of Byrd's class action complaint against Platinum. In the hearing the bankruptcy court conducted on the same day, the Chapter 11 trustee observed that Byrd's class actions offered him little promise of financial gain considering that Byrd had lost the majority of them and they were in the appeals process. At the August 21, 2006 hearing, the bankruptcy court characterized the Chapter 11 trustee's observations as "a business judgment determination" and remarked that they "turned out to be absolutely correct[] since that case was dismissed and there was no recovery." *Id.* at 62. In fact, in the July 14, 2004 hearing, the bankruptcy judge questioned (1) whether the trustee had any power to participate in the state law suits against Platinum and (2) whether the proceeds from such suits would even become part of the estate if Byrd ever recovered them. *See* Doc. No. 1-98 at 80–81. In short, Byrd's state law claims offered no value to the estate; the Chapter 7 trustee's failure to "collect" them is a nonissue.

Byrd's other observations are likewise unconvincing. Although the application for Shulman's employ as special counsel was broad, the terms of the appointment prohibited Shulman from representing the estate on any matters which involved transactions between Platinum and the estate. The record does not reflect that Shulman engaged in such representation. Furthermore, although Byrd cites 11 U.S.C. § 327(e) for the proposition that Shulman's alleged representation of the Chapter 7 trustee as general counsel was improper, § 327(e), by its terms, authorizes the court to appoint as special counsel "an attorney that has represented the **debtor**." 11 U.S.C. § 327(e) (emphasis added); *see also In re Tidewater Mem'l Hosp., Inc.*, 110 B.R. 221, 227 (Bankr. E.D. Va. 1989) (emphases added) (citing 11 U.S.C. § 327(e)) ("A purpose of § 327(e) is to allow counsel who cannot meet the disinterestedness requirement of § 327(a) nevertheless to render valuable services to the **debtor** in matters where counsel has no adverse interest. § 327(e) is specific, however, in prohibiting special counsel from representing the **debtor** "in conducting the case."). Here, Byrd does not allege, and the record does not reflect, that Shulman ever represented Byrd. Therefore, as with other arguments Byrd makes, the statutory basis on which he grounds this argument does not, by its literal terms, furnish him a foundation for relief.

Byrd's remaining assertions are trivial at best. Byrd contends that Shulman continued to represent Platinum in other matters when the bankruptcy court issued the December 6, 2002 order. This assertion flies in the face of the bankruptcy court's factual finding that Shulman ceased to represent Platinum no later than August 2002. Additionally, Byrd characterizes Platinum's bankruptcy litigation as "rabid" and "steroidal," from which the Court is supposed to infer that Platinum ran him through the meat grinder to pay him back for suing it in state court. This suggestion completely ignores Byrd's star role in unleashing the bankruptcy litigation by

29

failing to pay back Platinum the money he owed it. This suggestion also overlooks the 800-pound gorilla: Byrd's overzealous defense of the bankruptcy case. Because of Byrd's ravenous appetite for litigation, what started as an involuntary bankruptcy proceeding involving a single creditor snowballed into a pitched battle that resulted in Byrd's disbarment, not to mention a Pyrrhic victory in the form of an administratively insolvent estate. Accordingly, for the foregoing reasons, the bankruptcy court committed no error in its December 6, 2002 order granting the Chapter 7 trustee's application to employ Hoffman and Shulman Rogers as special counsel.

Byrd's second theory of relief is a rehash of the one the Court just rejected. Byrd maintains that the bankruptcy committed error in its October 5, 2004 order granting the application to employ Hoffman and Shulman as special counsel to the Chapter 11 trustee. Byrd's own words illustrate that the second assignment of error regurgitates the first: "For all the reasons James Hoffman and Shulman Rogers should not have been employed as 'Special Counsel' to the Chapter 7 trustee, they also could not be validly employed as counsel to the Chapter 11 Trustee." Br. Appellant 49, Doc. No. 10. The Court rejects this argument insofar as Byrd grounds it on a premise the Court just determined to be faulty.

The only new twist that Byrd's second assignment of error offers is the assertion that Hoffman and Shulman Rogers became creditors of the estate when the case was converted from Chapter 7 to Chapter 11 because (1) the conversion constituted a new order for relief and (2) their administrative claim for over $26,000 was pending at the time. In Byrd's estimation, because Shulman was a creditor, it could not have been a disinterested entity under § 327.

This argument is unpersuasive. First of all, Shulman did not become a creditor by virtue of the case's conversion to Chapter 11. Pertinently, 11 U.S.C. § 101(10) defines creditor as an "entity that has a claim against the debtor that arose at the time of or before **the order for relief**

30

concerning the debtor." 11 U.S.C. § 101(10)(A) (emphasis added). Here, the order for relief was entered on July 17, 2002. As the administrative claims in question did not arise until after this date, § 101(10)(A) is inapplicable.

Byrd's conclusory assertion that the conversion of the case constituted a "new Order for Relief" is shortsighted. Br. Appellant 49, Doc. No. 10. The case was not converted until June 25, 2004. The bankruptcy court did this through an "Order Converting Chapter 7 Case to a Case Under Chapter 11 on Debtor(s)'s Request." Doc. No. 1-76. The conversion order is not captioned as an order for relief and mentions nothing about abrogating and/or superseding the July 17, 2002 order for relief. Simply put, one more aptly characterizes it as a conversion order.

Although "[c]onversion of a case from a case under one chapter of this title to a case under another chapter of this title constitutes **an order for relief** under the chapter to which the case is converted," such conversion "does not effect a change in the date of the filing of the petition, the commencement of the case, or **the order for relief**." 11 U.S.C. § 348(a) (emphases added). Congress's use of the phrase "order for relief" twice in the same provision indicates a difference in the meaning of these phrases. Were it otherwise, the proviso that "an order for relief" does not cause a change in "the order for relief" would be superfluous. Congress's use of the indefinite article ("an") with one of the phrases "order for relief" and the definite article ("the") with the other also points to a distinction in their meaning.

Similarly, 11 U.S.C. § 348(c) contains language from which one can infer that these uses of "order for relief" have different meanings. Section 348(c) states that "Sections 342 and 365(d) of this title apply in a case that has been converted under section 706, 1112, 1208, or 1307 of this title, **as if the conversion order were the order for relief**." 11 U.S.C. § 348(c) (emphasis added). This language, likewise, lends itself to the inference that the conversion order is not "the

31

order for relief" in all cases. Accordingly, the July 24, 2004 conversion order does not constitute "the order for relief" under § 101(10)(A). This being so, Byrd's contention that the conversion order caused Shulman to become a creditor is without force.

Byrd's final theory of relief is that Shulman disregarded the bankruptcy court's orders by acting as de facto general counsel to the Chapter 11 trustee. By and large, the Court addressed—and discarded—this argument above. The terms of Shulman's appointment prohibited it from representing the estate on any matters that involved transactions between Platinum and the estate. Again, the record fails to reflect that Shulman engaged in the prescribed class of representation. Furthermore, it is unclear that § 327(e) would prohibit Shulman from acting as general counsel to the estate. After all, as stated in *In re Tidewater*, "[a] purpose of § 327(e) is to allow counsel who cannot meet the disinterestedness requirement of § 327(a) nevertheless to render valuable services to the **debtor** in matters where counsel has no adverse interest." 110 B.R. at 227 (emphasis added) (citing 11 U.S.C. § 327(e)). In this case, to reiterate, Shulman Rogers never represented Byrd. So, on its face, § 327(e) does not seem to come into play. Moreover, even assuming that Shulman's fleeting relationship with Platinum and/or the broad scope of the appointment created a semblance of a conflict, one would have to balance this loss against the gain thereby created. The bankruptcy court conducted such a balance and concluded as follows:

> Finally, the Court notes that there is an issue here that this has become a[n] extremely, extraordinarily complex case. Although the bankruptcy estate itself is relatively straightforward in the sense that there are only two secured creditors, a number of unsecured creditors and, I believe, one asset that has value, there is nevertheless over 700 entries between the 01 case and the 04 case. Mr. Byrd has filed any number of motions, motions to reconsider, appeals. Shulman Rogers' knowledge of this case is extraordinarily beneficial to the estate and the Court to sort through this case. Shulman Rogers' continuing retention, therefore, is of substantial benefit to the estate. And while that in and of itself is not a sufficient basis for a finding that it is appropriate to retain them under Section 327(c) or 327(e), it is a factor that is appropriate to consider.

*In re Byrd*, BP # 04-35620, Doc. No. 386 at 66. The Court wholeheartedly embraces these sentiments and adopts them as its own. Consequently, in view of the preceding considerations, the Court overrules Byrd's third assignment of error.

***

The preceding analysis shows that Byrd's three main arguments relating to purported conflicts of interest among Hoffman, Shulman Rogers, and the trustees all lack merit. Accordingly, for the reasons expressed above, the bankruptcy court did not err when it approved $351,622.51 in total administrative expenses.

## V.       CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the bankruptcy court's decision. A separate Order follows.

| March 19, 2012 | /s/ |
|---|---|
| Date | Alexander Williams, Jr. |
| | United States District Judge |